**UNITED STATES of America,
Plaintiff,**

v.

**Oren W. MAYBERRY,
et al., Defendants.**

**Civil Action No. H–04–3971.**

United States District Court,
S.D. Texas.

July 12, 2006.

Cynthia E. Messersmith, Dept. of Justice, Tax Division, Dallas, TX, for Plaintiff.

Kenneth T. Ward, Attorney at Law, Katy, TX, for Defendants.

Findings of Fact and Conclusions of Law

HUGHES, District Judge.

1. *Introduction.*

A man sues a title insurer for negligent misrepresentation. The company says that the suit is late and that it gave him what he requested. The man will take nothing.

2. *Buying Land.*

Robert Ceballos is a real-estate sales agent for Realty Executives. He has been licensed for about five years. In November 2002, he joined his supervisor at a luncheon hosted by Fidelity National Title Insurance Company. The purpose of the luncheon was to promote Fidelity's new Hispanic division.

At lunch, Ceballos says that he asked a Fidelity representative—Nancy Cepeda—to furnish him with real-estate record searches on properties for his personal investment in exchange for his referring his clients to Fidelity for title insurance. He says that she agreed. Cepeda testified that she could not recall their conversations.

In January 2003, Ceballos referred a client—Andrew Okakhere—to Fidelity for a title insurance policy. Fidelity searched the record, issued a title-policy commitment, and used the results to limit the policy that it issued and Okakhere paid for.

Near the end of that month, Ceballos asked Cepeda for information about the property at 6701 Mobud Drive in Houston. He was considering buying the property as an investment from the owner who was so delinquent in his mortgage that the holder was going to foreclose the first week of February. In response, Cepeda sent Ceballos copies of (a) the warranty deed vesting the property in Oren W. Mayberry, (b) the current deed of trust, and (c) the second correction of a transfer of notes filed by the holder of the deed of trust.

Ceballos pleaded and swore that Cepeda also told him that the property was "free and clear." Cepeda swore that she has little recollection of the request but that "current owner" information is what Fidelity customarily furnishes agents as a courtesy. That is in fact what she sent Ceballos, corroborating her testimony with her contemporaneous act. The absence of a second request from Ceballos for the full title report is his contemporaneous act, and it undermines his story.

On January 29, 2003, Ceballos and his wife—Angela Reid—purchased the property. Mayberry issued them a handwritten general warranty deed. Ceballos bought no title insurance.

### 3. Meeting the IRS.

In September, the Internal Revenue Service contacted Ceballos about its lien that encumbered the property. Ceballos was then told that four months before he took title—on November 21, 2002—the Service had filed a federal tax lien with Harris County. At the time of the Mayberry–Ceballos transfer, the Service had not been paid, and Ceballos acquired the land burdened with the lien.

### 4. Attacking Fidelity.

On October 22, 2003, Ceballos sued Fidelity in the county court of Harris County, Texas. On January 20, 2005, he abandoned that suit. He has never sued Mayberry.

On October 14, 2004, in this court, the government sued Mayberry, Ceballos, and Reid to foreclose its liens.

A year later, on October 18, 2005, Ceballos and Reid filed a third-party complaint against Fidelity in the foreclosure case, asserting negligence and gross negligence. The government has settled with Ceballos; in early May 2006, Ceballos arranged to relieve the property of the lien by paying the Service $24,826.

On May 11, 2006, this court held a bench trial on Ceballos's claims against Fidelity.

### 5. Reid's Standing.

■ Angela Reid has no standing against Fidelity for she did not deal with it at all. She made no request of it, directed no business to it, and relied—as far as this record shows—on no representation to her by it. Her status as an acquirer of the land is not sufficient; she was the beneficiary of her husband's deal with Mayberry and his decision not to insure the title.

### 6. Limitations.

For this discussion of limitations, the court will assume that Fidelity committed a wrong. That wrong would have been the issuance of a title report that was unreasonably in error.

In January 2003, based on that assumed report, Ceballos paid cash for and accepted land that was encumbered by a lien undisclosed in the report. In September, Ceballos had actual notice of the impediment

to his title when the Service visited him. Between January and September, he had constructive notice because the lien was recorded in the public county records.

Fidelity says that Ceballos's claim is barred by the two-year statute of limitations for a tort. Ceballos argues that the time started running only when the Service filed its complaint to foreclose on the property in October 2004. Before that, he says, he had no injury.

■ The two-year limitation period begins on the date of the deed. When Ceballos acquired the property it was burdened by the lien. His injury was complete—in fact and at law.

That the precise quantity of damages was not fixed at that point is insignificant. Even if the injury was only the modest transactional cost to correct an error by the Service, it was a clear impediment to marketable title. *See Lund v. Emerson*, 204 S.W.2d 639, 642 (Tex.App.1947, no writ). In fact, if the Service had filed a lien that claimed a zero balance, it would have been an impediment to marketable title. No one would buy land that included the presence of the Service in his chain of title for the same price that he would pay for the land without it.

At the end of the trial, Ceballos asked to make the legal theory one of breach of implied warranty so he could argue a four-year limit. To have an implied warranty, one must have some transaction of substance that implies something. He does not have one; casual favors imply nothing.

Ceballos's claims are barred. Even if they were not, they would fail.

## 7. *Contract.*

There is no contract. There was a gratuitous undertaking—no professional service, no writing, no terms, and no consideration.

## 8. *Misrepresentation.*

■ In Texas, to prevail on a claim of negligent misrepresentation, Ceballos must show:

· Fidelity represented a fact in the course of its business or in a transaction of pecuniary interest to it;

· Fidelity supplied erroneous information for Ceballos's guidance;

· Fidelity did not exercise reasonable care in obtaining the information; and

· Ceballos incurred a financial loss through justifiably relying on the representation. *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex.1991)(citing the Restatement (Second) of Torts (1977)).

### A. *Course of Business.*

■ Fidelity is in the business of selling escrow service, title reports, and title insurance. Ceballos relies on a statement, however, that was not in a transaction with Mayberry or him in which Fidelity had a pecuniary interest. Also, neither Mayberry or Ceballos was a third-party beneficiary of a transaction in which Fidelity had a pecuniary interest. An act done at the office or about the nature of ones work is not necessarily "in the course of" that work; that phrase implies a substantial connection to business being conducted.

■ Fidelity did a marketing favor for someone who might have been in a position to assist it in getting business from third parties. The requirement of a pecuniary interest on the part of the person representing things constrains people to be responsible only for things they say for compensation, and it works to preclude liability to people who scavenge business services without engaging the supplier with a specific request and payment. Favors, solicitations, and other forms of marketing are not significant, commercial rep-

resentations. *See* Restatement (Second) of Torts § 552 cmt. c (1977).

Fidelity actually had a pecuniary interest in the transaction with Okokhere. He paid it, and it insured his title; acts missing from the Fidelity–Ceballos conversation. Likewise, in the Okokhere deal, Ceballos was interested in the underlying sale of the real estate; he had a direct interest from his listing agreement with the seller. Still, Fidelity's and Ceballos's interests in the transaction were independent and created no fiduciary relationship between the two of them.

The restatement is clear that gratuitous favors, even with the expectation of reciprocal favors, require willful misbehavior rather than error. The facts here show no negligence, no willfulness.

■ Properly construed, "in the course of the business," does not include marketing. Fidelity took Ceballos's employer to lunch and included him. Ceballos decided to attempt personal lagniappe off Fidelity's solicitation of his boss. Nothing creates a special relationship, contract, consideration, or duty in mass marketing, niche marketing, or seminars for realtors.

## B. *Informational Error.*

■ Cepeda's recollection of the transaction was reasonably clear and made more clear by what she did immediately after the conversation—supply the current documents of title.

Cepeda furnished the documents—the warranty deed, the current deed of trust, and the second correction transfer of notes and liens filed by the holder of the deed of trust. Ceballos had nothing to suggest that Cepeda represented that the documents were the result of an exhaustive title search. The copies just arrived with a transmittal note—not with a report expressing the state of the title except what the documents said on their face.

Cepeda's recollection and performance are not inconsistent with Ceballos's testimony as a whole. While he now claims that he asked for a lien search, it is clear that Ceballos did not know what to ask for. He testified that he wanted to know the state of title. He swore absolutely that he would not buy the property with encumbrances. He said he was "always careful with title searches, but I didn't go through it. I've never seen a search report in my life." Ceballos then clarified that he meant that he had never actually read a report. He simply had handed them to his clients, after he got them from the title company as the cover sheet of the Okokhere transaction indicates.

Parenthetically, Ceballos told the court that he did not tell Okokhere about a federal tax lien reported in the title search on that transaction.

It is clear that Ceballos never asked specifically for a lien search and that he would not have read it had he gotten it. The information that Fidelity gave him was accurate. Fidelity did not represent to Ceballos that it had reported on the title to the Mobud land. Those three instruments are copies—not opinion or analysis.

## C. *Care.*

■ Having found that the representation was true and not in the course of business, the care used by Fidelity is addressed contingently. The question of reasonable care turns back, first, on the request. The request appears to have been—as the court finds that it was—for current ownership documents. That is what Ceballos got—with no statement.

Ceballos gave no indication of what standard Fidelity would have failed, if all the other things up until this point had been met. Ceballos's technical witness—Henry Canfield—was a long-time buyer of properties out of foreclosure. He had no idea

of the error rates of title companies. He did not know the differential rates of effectiveness between records companies and title companies. Canfield was of no use to the court since he was insufficiently precise and rigorous to supply anything other than the opinion, "Some of us do title searches." Canfield said that in his business he performed his own title searches; so, he is not even an experienced consumer of title-searches. Because he testified that he finds it easy in the distressed property acquisition and resale to do the searches himself, the best the court could infer is that it should have been easy for somebody else to do it.

Ceballos usually paid a legal research company to check title on his investment properties. He testified that he wanted to avoid paying a $40 fee to the research firm for a one-percent error rate, but he expected to get a zero error rate for nothing from Fidelity. He expected by this casual favor for Fidelity, in effect, to do what it would have done for $900—ensure title. Ceballos quite simply here is asking that the putative abstracting error entitle him to the benefits of a title-insurance policy.

Fidelity used reasonable care in responding to the request that was actually made rather than the request that Ceballos wishes that he had made given the unfortunate outcome of his deal with Mayberry.

### D. Reliance.

█ Ceballos did suffer pecuniary loss; however, even if Ceballos had asked for a lien report and Fidelity had not furnished it, his reliance would not be reasonable. Ceballos asked informally for uncompensated assistance in determining the state of title. He cannot reasonably rely on that kind of favor as the predicate for a $100,000 real-estate transaction.

People pay legal researchers, title companies, and lawyers carefully to inform them about the complications in a tract's title so that they get higher quality work than from passing favors and, in the case of title companies, work with a written guaranty funded by a reserve.

Ceballos clearly told the court that he was choosing to forego title insurance and record searches to save money. The legal research company would have done for $40 what Fidelity would have done for $150—a title search without a commitment. And if Ceballos had asked for it, he would have gotten it; but he would have owed $150. He made an economic decision, and he takes the economic consequences. He cannot have the best of both worlds, choosing not to buy what reasonable investors use in acquiring property and getting the benefit of the unpurchased service.

While it is a perfectly legal choice for Ceballos to make, he takes the consequences of that choice. He has more money to invest in real estate but less assurance that he has good title to that investment.

### 9. Conclusion.

Ceballos acquired the property through a general warranty deed. On the face of the instrument, Mayberry owes Ceballos $24,826. Ceballos's pecuniary loss based on the negligence of Fidelity must be reduced, were he to recover, by the obligation of Oren Mayberry to Ceballos.

Ceballos by his own testimony established that he had neither the ability or initiative to understand what to request and understand whatever he got from Fidelity. If he "never read" reports, he could not rely on their contents.

Ceballos and Reid will take nothing from Fidelity.